# UNITED STATES DISTRICT COU8RT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KAREN KELLY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )　　　No. 07 C 1005 |
| DEAN CHAMBERS, CRAIG ESPLIN, | ) |
| RAMTIN SABET, MAYNARD | ) |
| WILLIAMS, and THE VILLAGE OF | ) |
| OAKWOOD HILLS, IL, | ) |
| | ) |
| Defendants. | ) |

## <u>MEMORANDUM ORDER AND OPINION</u>

MARVIN E. ASPEN, District Judge:

Presently before us is a Motion for Summary Judgment filed by Defendants Dean Chambers ("Chambers"), Craig Esplin ("Esplin"), Maynard Williams ("Williams"), Ramtin Sabet ("Sabet"), and the Village of Oakwood Hills, Illinois ("Village") (collectively, "Defendants"). Also before us is Plaintiff's Motion to Strike Defendants' Local Rule 56.1 Statements. For the reasons stated below, we grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion to Strike.

## SUMMARY OF THE FACTS[1]

Plaintiff is a resident of Oakwood Hills, Illinois and a former trustee of the Village. (Def.'s SOF ¶ 1.) She is also the co-founder of the Independent Citizens Police Committee

---

[1] Unless otherwise noted, the facts described herein are undisputed. We primarily rely on the parties' Local Rule 56.1 statements of uncontested facts.

("Committee").  (Pl.'s SOF ¶ 1.)  Part of Plaintiff's work on the Committee included leading a

campaign to eliminate the Oakwood Hills Police Department.  (*Id.*)  At all times relevant to this

motion, Chambers served as the Village President (also known as the Mayor); Esplin was a

fellow Village Trustee; Williams was the Oakwood Hills Chief of Police; and Sabet was an

Oakwood Hills patrol officer.  (Def.'s SOF ¶ 2.)

On August 26, 2006, Sabet stopped Plaintiff's son for a traffic violation.  (*Id.* ¶ 7.)  While

Sabet conducted the stop, Plaintiff and her husband arrived on the scene.  (*Id.* ¶ 8.)  Although

Plaintiff disputes the following allegation, Sabet claims that Plaintiff obstructed him at the stop

by standing at the door of his car and ignoring his requests to move, forcing him to gently push

her away from the door so that he could open it.[2]  (*Id.* ¶ 11; Pl.'s Resp. to Def.'s SOF ¶ 11.)

During the stop, Sabet called his supervisor, Sergeant Goldman, to inform him of the situation.[3]

(Def.'s SOF ¶ 10.)  The two decided not to issue any tickets to either Plaintiff's son or Plaintiff.

(Def.'s SOF ¶ 8.)  Goldman testified that he contacted Deputy Chief Lezon while Sabet was still

---

[2] Video evidence taken from the police car shows Sabet stopping Plaintiff's son, Plaintiff arriving on the scene and interacting with her son in the stopped car, then walking to the police car.  (Pl.'s SOF, ex. C.)  However, because Plaintiff stepped out of the camera's view and the microphone worked intermittently, the video does not show whether Plaintiff in fact blocked Sabet's exit from his vehicle.  (*Id.*)  Approximately 45 seconds after Plaintiff disappeared from view, she, her husband, and Sabet walked towards her son's car, where her husband retrieved the insurance information and produced it to Sabet.  At that point, Sabet told Plaintiff that he was giving her son a break, but that he did not appreciate her obstructing his duties and asked her to step aside.  Plaintiff stated that she was not obstructing his duties.  Sabet asked Plaintiff whether she "understood his instructions," and Plaintiff ultimately stepped aside.  Sabet completed the stop, and all parties left the scene.  (*Id.*)

[3] Sabet and Goldman both testified that Sabet called Goldman while at the stop.  (Def.'s SOF ¶ 9.)  However, Plaintiff denies this statement because she "did not observe Sabet make any calls while at the scene of the traffic stop." (Pl.'s Resp. to Def.'s SOF ¶ 9.)  Plaintiff has not provided a sufficient basis to deny the statement, as she may have simply been unaware that Sabet was on the phone.

at the scene of the traffic stop.[4]  (Def.'s SOF ¶¶ 33-36.)  Lezon advised Goldman to tell Sabet to

allow the situation to "calm down" and to "let it go."  (*Id.* ¶ 36.)  Within a week after the

incident,[5] Lezon spoke to Chief Williams about the incident and Williams mentioned it to Mayor

Chambers.  (*Id.* ¶¶ 41, 73, Ex. G, Chambers Dep. 24-25.)  Although the timing is unclear, at

some point after the traffic stop, Sabet had a conversation about the incident with Williams.  (*Id.*

¶¶ 18, 49.)  Chambers discussed the incident with Village attorney, Susan McCabe, in mid-

September.[6]  (Def.'s SOF ¶ 75 & Ex. H, Chambers Dep. 55-56.)  McCabe advised Chambers to

get more information about the situation.  (*Id.* ¶ 76.)

     Beginning on October 17, 2006, Plaintiff circulated flyers advertising an October 24th

meeting, at which Sheriff Nygren was scheduled to speak about Plaintiff's proposal to replace

the Oakwood Hills Police Department with the McHenry County Police Department.  (*Id.* ¶ 11-

12.)  Williams and Chambers both attended this meeting.  (Pl.'s SOF ¶ 22.)  There is evidence

that Defendants opposed this proposal.  For example, Williams and Sabet would have lost their

jobs if this proposal were accepted.  Additionally, both Williams and Chambers expressed

opposition to this position.  (*Id.* ¶¶ 16-17.)

     Around the time of the meeting, Chambers sought more information about the traffic

---

[4] Although Plaintiff denies this fact, as she denies many others, she did not have the
required knowledge to deny the phone conversation.  Therefore, like other statements that she
denied without the requisite knowledge, we will, for the purpose of this motion, deem them as
undisputed facts.

[5] The exact dates are unknown.  (Def.'s SOF ¶ 41.)

[6] At his deposition, Chambers had difficulty recalling exactly when he spoke with
McCabe.  (Def.'s SOF ¶ 75.)  However, after a break, he recalled that he first spoke with
McCabe in September, before she left for vacation.

stop, per McCabe's instructions. (Def.'s SOF ¶ 76.) During that time he spoke with the Village prosecutor and spoke with Officer Sabet about the situation. (*Id.* ¶¶ 77-78, Ex. H, Chambers Dep., pp. 58-59.) Although Sabet's and Chambers' testimonies were inconsistent regarding when they met and the circumstances under which they met,[7] both ultimately testified that they met in late October, a day or two before October 25, 2006. (*Id.* ¶¶ 14-16, 77-80.) The day after Chambers' conversation with Sabet, he contacted Chief Williams to request a copy of the police report and the videotape of the incident. (*Id.* ¶ 81.) Williams testified that he first realized Sabet had not prepared a report of the incident upon Chambers' request for a copy of the report.[8] (*Id.* ¶ 58.) Upon that realization, Williams ordered Sabet to prepare a report. (*Id.* ¶¶ 17, 60-61.) Sabet prepared the report on October 25, 2006, one day after Plaintiff's meeting. (Def.'s SOF ¶ 17.)[9]

---

[7] For example, Sabet first testified that he talked to Chambers one week after the incident. (Pl.'s Resp. to Def.'s SOF ¶ 14, Ex. F, Sabet Dep. 7.) After a break during the deposition, Sabet changed his testimony to indicate that he did not meet with Chambers until approximately two months after the incident. (*Id.*, Ex. F., Sabet Dep. 65.) Similarly, Chambers first recalled that he spoke with Sabet in late September, but changed his testimony to reflect that they met in late October. (Def.'s SOF ¶ 77.) Sabet also testified that Chambers asked him into his office on an unrelated matter and that Sabet mentioned the issue in passing. (Pl.'s Resp. to Def.'s SOF ¶ 15.) However, Chambers recalls that the conversation took place in a parking lot and that Sabet approached him to specifically discuss the situation with Plaintiff. (Pl.'s Resp. to Def.'s SOF ¶ 78.)

[8] Plaintiff denies this statement and cites for support Williams' testimony regarding a strict policy for generating reports. (Pl.'s Resp. to Def.'s SOF ¶ 58.) Williams did testify that under the department's policy, a report should have been generated within a day or two of the event. (*Id.*, Ex. G, Williams Dep. 50.) He also explained the procedure in place to determine whether a report is missing. (*Id.*) However, other evidence indicates that the procedure failed in this case because an incident number was not created until October 25, 2006. (Reply at 7; Resp. to Pl.'s SOF ¶ 4 & Ex. 1, Williams Aff. ¶ 2.) Therefore, although it is undisputed that this policy exists, the evidence indicates that the report went unwritten until October 25, 2006 and that Williams first became aware of that fact when Chambers requested a copy of the report.

[9] Sabet's testimony regarding when he wrote the report varied in his deposition. When first asked, he stated that he completed the report within two weeks of the incident. (Pl.'s Resp. to Def.'s SOF ¶ 17 & Ex. F, Sabet Dep. 14:1-8.) However, Sabet admitted that he was not

The report indicated that after asking Neil Kelly, the Plaintiff's son, for his driver license and proof of insurance, Neil responded that he did not have his driver's license and he did not give Sabet his insurance card. (Pl.'s Resp., Ex. B.) Sabet returned to his vehicle just before Plaintiff and her husband approached. The report indicated that Plaintiff blocked Sabet from exiting his vehicle, that Sabet had to ask Plaintiff to move four times, that he had to slowly push Plaintiff with the door of his car to exit the vehicle, and that he advised them that they were obstructing his duties and requested them to step aside. (*Id.*) Deputy Chief Lezon approved this report on October 31, 2006. (Mem. at 4.)

The day after Sabet prepared the report, on October 26, 2006, Mayor Chambers emailed Village Trustee Esplin, to determine whether to pursue the issue any further. (Def.'s SOF ¶ 87, Ex. B.) Williams presented this information at the November 2006 meeting of the Village's public safety and finance committee ("Committee"), of which Esplin was a member. (*Id.* ¶¶ 109-11.) The committee voted unanimously to request the entire Board of Trustees to consider the issue and determine whether Plaintiff abused her office. (*Id.* ¶¶ 110, 113-14.) The issue was addressed by the full Board in December 2006. (*Id.* ¶ 112.) After Esplin introduced the matter, the Board asked Plaintiff to speak. (*Id.* ¶ 115.) Plaintiff, however, refused to answer any questions about the incident and stated that this was "a bunch of bullshit." (*Id.* ¶ 116.) The committee sent a letter to Kelly in January 2007, requesting a meeting with her so she could

---

absolutely certain about this time period, and even stated that it would not be a misrepresentation for someone to say that he generated the report two months after the incident, because it had been two years since the incident. (*Id.* at 24-25.) After a break in the deposition, Sabet changed his testimony to reflect that he did not prepare the report until October 2006. (*Id.* at 62-65.) Plaintiff argues that there were two reports, and that Defendants colluded to destroy the first. (Resp. at 11.)

explain her version of the events.  (*Id.* ¶ 117.)  Finally, in April 2007, the Board voted

unanimously to censure Plaintiff.  (*Id.* ¶ 120.)

Plaintiff filed this lawsuit against Defendants for First Amendment Retaliation (Counts I-

IV, VII-X) and conspiracy to retaliate under 42 U.S.C. § 1983 (Count V).  (3d Am. Compl.)

Plaintiff also alleged a § 1983 equal protection, class of one claim against the individual

Defendants (Count VI), a § 1983 defamation claim against the Village (Count XI), and an

individual state-law claim against Sabet (Count XII).[10]  (3d Am. Compl.)  However, in her

response, Plaintiff withdrew the latter three counts, as well as the claims against Esplin.  (Resp.

at 8, n.2.)

## STANDARD OF REVIEW

Summary judgment is proper only when "there is no genuine issue as to any material fact

and the moving party is entitled to a judgment as a matter of law."  Fed R. Civ. P. 56(c).  A

genuine issue for trial exists when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct.

2505, 2510 (1986).  This standard places the initial burden on the moving party to identify "those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986)

(internal quotations omitted).  Once the moving party meets this burden of production, the

nonmoving party "may not rest upon the mere allegations or denials of the adverse party's

---

[10] The other individual defamation claims against Williams and Esplin were dismissed
pursuant to Plaintiff's motion for voluntary dismissal.  *Kelly v. Chambers*, No. 07 C 1005, 2008
WL 4279976, at *4 (N.D. Ill. Sept. 17, 2008).

pleading" but rather "must set forth specific facts showing that there is a genuine issue [of material fact] for trial." Fed. R. Civ. P. 56(e). In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255. However, "our favor toward the nonmoving party does not extend to drawing 'inferences that are supported by only speculation or conjecture.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quoting *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008)). Therefore, the plaintiff cannot merely "raise some metaphysical doubt as to the material facts; [she] must come forward with specific facts showing that there is a genuine issue for trial." *Keri v. Bd. of Trs. of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006).

## ANALYSIS[11]

---

[11] As an initial matter, we deny Plaintiff's Motion to Strike Defendants' Rule 56.1 Statement of Material Facts. Rule 56.1 of the Local Rules of the Northern District requires parties moving for summary judgment to file a statement of material, undisputed facts, which "shall consist of short numbered paragraphs, including within each paragraph specific references . . . to the record." N.D. Ill. R. 56.1(a). Plaintiff's objections to Defendants' Rule 56.1 Statement concern the length of the individual statements and the content of some of those statements as opinion or highly subjective statements. (Mot. to Strike ¶¶ 6-8.) "Motions to strike are disfavored; such motions are typically denied unless they serve to expedite the work of the court." *Indep. Trust Corp. v. Fidelity Nat'l Title Ins. Co. of New York*, 577 F. Supp. 2d 1023, 1052 (N.D. Ill. 2008). Furthermore, "the decision whether to apply the rule strictly or to overlook any transgression is one left to the district court's discretion." *Little v. Cox's Supermarkets*, 71 F. 3d 637, 641 (7th Cir. 1995); *see also Santora v. Starwood Hotel and Resorts Worldwide, Inc.*, 580 F. Supp. 2d 673, 675 (N.D. Ill. 2008). We do not think that Defendants have so egregiously violated Local Rule 56.1 that we would waste our time, and the parties' time, in requesting Defendants to submit another Statement of Facts. The Plaintiff complains that Defendants' "paragraphs contain lengthy, unintelligible, and often nonsensical assertions that Plaintiff can neither admit nor deny." (Mot. to Strike ¶ 6.) She further argues that Defendant includes multiple facts in one paragraph, which "effectively confused the issues." (*Id.*) We disagree. Defendants may not have used the clearest language or sentence construction; however, the statements were answerable and are consistent with prior Rule 56.1 Statements presented to this court. Plaintiff's Motion to Strike is, accordingly, denied.

## I. Count V – § 1983 Conspiracy Claim Against Chambers, Williams, and Sabet

In Count V, Plaintiff alleges that Chambers, Williams, and Sabet[12] "conspired to injure the Plaintiff" by: (1) creating a police report two months after the traffic stop described above and giving the report to Village officials; (2) "fabricating malicious allegations against the Plaintiff for the purpose of retaliation and humiliation; and (3) allowing a fact-finding probe to commence against the Plaintiff, knowing, with certainty, the allegations to be false." (3d Am. Compl. ¶ 51.)

"A civil conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Rotermund v. U.S. Steel Corp.*, 474 F.2d 1139, 1145 (7th Cir. 1973); *Jones v. City of Chi.*, 856 F.2d 985, 992 (7th Cir. 1988); *Kunz v. City of Chi.*, 234 F. Supp. 2d 820, 823 (N.D. Ill. 2002). To establish § 1983 liability under a conspiracy theory, Plaintiff must show that: (1) Defendants "reached an understanding to deprive the plaintiff of [her] constitutional rights"; and (2) Defendants were "willful participants in joint activity with the State or its agents."[13] *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003) (internal citations omitted). Accordingly, to succeed on this claim, Plaintiff must show that the Defendants reached an agreement to violate her constitutional rights. Plaintiff may demonstrate that Defendants reached an agreement by establishing that Defendants "[understood] the general objectives of the

---

[12] Although Plaintiff included Esplin in her Third Amended Complaint, she has since dismissed this cause of action against him. (Resp. at 8, n.2.)

[13] Because there is no dispute that Defendants were state actors and acted under color of the law as required by § 1983, the second element of § 1983 conspiracy is satisfied.

scheme, accept[ed] them, and agree[d], either explicitly or implicitly, to do [their] part to further them." *Jones*, 856 F.2d at 992. "If the agreement is not overt, the acts must raise the inference of a 'mutual understanding' or a 'meeting of the minds' between the defendants." *Montgomery v. City of Harvey*, No. 07 C4117, 2008 WL 4442599, at *5 (N.D. Ill. Sept. 29, 2008) (quoting *Amundsen v. Chi. Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)).

As Plaintiff argues, she may sustain her claim of civil conspiracy through circumstantial evidence, rather than direct evidence. *Id.*; *Hoffman-La Roche, Inc. v. Greenberg*, 447 F.2d 872, 875 (7th Cir. 1971). However, the Seventh Circuit has "stressed that such evidence cannot be speculative." *Williams*, 342 F.3d at 785. For example, in *Williams*, the Seventh Circuit held that evidence that defendants opposed plaintiff's statement for which he claimed to be retaliated against was insufficient to establish that those who opposed the statement formed an agreement to deprive the plaintiff of his constitutional rights. *Id.* Additionally, in *Williams*, a friend of one of the defendants testified that the defendant said he was "involved" in plaintiff's termination. *Id.* at 786. Indeed, that witness testified that the defendant's use of the word "involved" meant that he had done more than just complained about plaintiff's statement, although he later admitted it could have meant that he simply complained about the plaintiff. *Id.* The court rejected this testimony as evidence of an agreement, explaining that it only proves the defendant in question complained to the plaintiff's employer, but it did not "constitute[] evidence from which a conspiracy may be inferred." *Id.* Similarly, in *Goetzke v. Ferro Corp.*, 280 F.3d 766 (7th Cir. 2002), the Seventh Circuit rejected speculative circumstantial evidence as proof of an agreement. The court held that evidence of numerous phone calls between the alleged conspirators, "standing alone merely proves that [they] remained in contact . . . . To assert that

the calls are evidence of a conspiracy is simply speculation." *Id.* at 778.

Defendants argue that Plaintiff has not presented sufficient evidence to constitute an agreement.[14] Plaintiff contends, however, that the following facts are enough to allow a jury to infer the Defendants had a "meeting of the minds": (1) Mayor Chambers did not speak to Officer Sabet about the incident until after he saw the flyers Plaintiff distributed (approximately two months after the traffic stop); (2) Chambers spoke to Chief Williams the day after he saw the flyers; (3) Williams publicly disagreed with Plaintiff's position on replacing the Village's police department; (4) all Defendants had motive to retaliate against her – Sabet's motivation was to punish her for her criticism of the department, Chambers and Williams expressly opposed Plaintiff's position, and Williams and Sabet would have lost their jobs had Plaintiff's position been accepted; and, (5) with knowledge that it was possible that Plaintiff could be criminally prosecuted based on the police report, Sabet prepared the report the day after her October 25th

---

[14] Defendants also argue that Plaintiff cannot prove a conspiracy existed because the intra-corporate conspiracy doctrine applies to Defendants. (Mem. at 6-7; Reply at 5.) However, we agree with Plaintiff that this doctrine does not apply to protect Defendants. Under the intra-corporate conspiracy doctrine, employees or managers of a corporation "jointly pursuing its lawful business do not become 'conspirators' when acts within the scope of their employment are said to be discriminatory or retaliatory." *Wright v. Ill. Dep't of Children and Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994) (citation omitted). This doctrine has been applied in employment cases involving § 1983 claims brought against government employees or administrators. *See, e.g.*, *Simonsen v. Bd. of Educ. of the City of Chi.*, No. 01 C 3081, 2002 WL 230777, at *7 (N.D. Ill. Feb. 14, 2002); *Tabor v. City of Chi.*, 10 F. Supp. 2d 988, 994 (N.D. Ill. 1998); *Doe v. Bd. of Educ. of Hononegah Cmty. High Sch. Dist. No. 207*, 833 F. Supp. 1366, 1381-82 (N.D. Ill. 1993). However, as we held in *Hobley v. Burge*, "the doctrine should not be extended to shield defendants from § 1983 conspiracy claims based on egregious police conduct such as that alleged here." No. 03 C 3678, 2004 WL 1243929, at *10 (N.D. Ill. June 3, 2004). Plaintiff alleges a conspiracy in which the Defendants generated a false police report used to instigate an investigation into her position as a Trustee, all in retaliation for her exercise of her First Amendment rights. Although, as discussed later, her claim of conspiracy is not supported by the evidence, such a claim of conspiracy cannot be protected by the intra-corporate conspiracy doctrine.

meeting.  (Resp. at 11-12.)  Furthermore, Plaintiff cites to the following inconsistencies in Defendants' testimonies as evidence of an agreement: (1) Sabet originally testified that he wrote the report within two weeks of the incident, but changed his testimony to reflect that he wrote it two months later; (2) Chambers altered his testimony regarding the timing of his conversation with Sabet; (3) Chambers and Sabet gave contradictory statements regarding where they spoke and how the topic of the traffic stop was introduced.  (Resp. at 14-15.)  Even drawing all reasonable inferences in Plaintiff's favor, we agree with the Defendants that this circumstantial evidence is not sufficient to create a triable question of fact for a jury.

Although the Defendants' opposition to Plaintiff's proposal may constitute motive to conspire against Plaintiff, motive alone is not sufficient to create a triable issue.  *Williams*, 342 F. 3d at 785 (concluding that evidence that those accused of conspiring against a plaintiff publicly admitted that they disagreed with the plaintiff and that the disagreement created tense relationships was not sufficient to support a conspiracy allegation).  Therefore, the fact that Defendants publicly disagreed with Plaintiff is not sufficient to support her allegations of an agreement.

Additionally, we think that the evidence of suspicious timing in this case is merely speculative, and is not enough to demonstrate the Defendants agreed to conspire against Plaintiff.  *See, e.g.*, *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (explaining that "'[s]uspicious timing alone rarely is sufficient to create a triable issue'" of a causal connection at the summary judgment stage in Title VII discrimination and retaliation cases) (quoting *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006)); *Argyropoulos v. City of Alton*, 539 F.3d at 732 (directing courts not to infer issues of fact from

mere speculation).  It is also unclear which timing is relevant: the timing of Sabet's initial

statements reflecting the same facts stated in his report; the creation of the report; or, the

presentation of the report to the Trustees?  There is no real dispute that Sabet told Goldman

about the incident the night it happened.  (Def.'s SOF ¶¶ 9-11.)  Goldman relayed that version of

the incident to Lezon, and within a week both Williams and Chambers were informed of the

accident.  (Def.'s SOF ¶¶ 29, 33, 41.)  Plaintiff even contends that Defendants knew about her

criticism of the police department well before her October 24th meeting.  (Pl.'s Resp. to Def.'s

SOF ¶ 24.)  If Defendants knew about Plaintiff's positions regarding the Village police

department two months before generating the alleged false report, as she claims they did (Pl.'s

SOF ¶¶ 2, 5), the timing is even less suspicious.

   Moreover, although Plaintiff attempts to turn the Defendants' deposition inconsistencies

into issues of fact, such inconsistencies are not enough to demonstrate that the Defendants

entered into an agreement to retaliate against Plaintiff.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

256-57, 106 S. Ct. at 2514 ("[D]iscredited testimony is not normally considered a sufficient basis

for drawing a contrary conclusion.") (internal quotations omitted); *Outlaw v. Newkirk*, 259 F.3d

833, 840-41 (7th Cir. 2001) ("The mere prospect of challenging a witness's credibility in this

manner is not enough, standing alone, to avoid summary judgment.").  This case does not

involve "sham affidavits" where a testifying party later submits an affidavit to change prior

deposition testimony.  Although such "sham affidavits" are looked down upon, the rationale for

disfavoring "sham affidavits" does not extend to discrepancies within the same deposition.  *E.g.*,

*Gullick v. Ott*, 517 F. Supp. 2d 1063, 1075 (W.D. Wis. 2007).  The facts underlying the

inconsistencies are not disputed; only the timing of the facts is disputed.  Plaintiff argues that it

is suspicious that there is "clarity on only one fact, the precise manner in which Plaintiff obstructed Defendants Sabet, even though their testimony regarding several other facts continually changed throughout their depositions." (Resp. at 12.) However, such speculation is not sufficient to defeat summary judgment and create a genuine issue of material fact. *Williams*, 342 F.3d at785; *Argyropoulos*, 539 F.3d at 732.

Similarly, Plaintiff attempts to create issues of fact through further speculation and conjecture. For example, Plaintiff argues that Sabet actually prepared two reports: one within two weeks after the stop and a second on October 25, 2006. (Resp. at 2, 5.) Plaintiff draws this conclusion from Sabet's inconsistencies in his deposition testimony. (*Id.*) However, there is nothing to suggest that Sabet prepared two reports. He never testified that he created two reports and Plaintiff did not present any evidence of the existence of a second report. Although Sabet had difficulty recalling when he created the report, his testimony identified only one report. (Pl.'s SOF, Ex. F, Sabet Dep. 14, 20, 24, 62-63.) After his initial testimony that he created the report within two weeks, Sabet also stated that he did not believe it would be a misrepresentation for someone to say that he did not create the report until two months after the incident. (Def.'s Resp. to Pl.'s SOF, Ex. A, Sabet Dep. 24-25.) He clarified that since two years had passed since he wrote the report, his memory could be wrong about the date he prepared the report. (*Id.*) This testimony, accompanied by his later testimony at the same deposition stating that it was actually two months after the incident when he prepared the report, does not provide evidence of a second report. Accordingly, Plaintiff's attempts to create a question of fact regarding a second report and any agreement by the Defendants to destroy the first report are based on mere speculation and conjecture and are insufficient to support her allegations of a conspiracy.

Plaintiff argues that the evidence of an agreement in her case is similar to the evidence presented in *Jones*, 856 F.2d 985, and *Vasquez v. Hernandez*, No. 91 C 4088, 1994 WL 201092 (N.D. Ill. May 18, 1994), and we should, accordingly, determine that there is a triable question of fact.  (Resp. at 11.)  In *Jones*, the plaintiff brought various claims against defendant officers and the city, including a § 1983 alleging that defendants conspired to falsely arrest, imprison, and maliciously prosecute him.  856 F.3d at 988.  Although defendants argued there was not enough evidence of conspriacy, the Seventh Circuit upheld a jury verdict against defendants.  *Id.* at 992.  However, the facts supporting that verdict were significantly more specific than the facts at issue in this case.  For example, although the court recognized that the evidence was weakest for the officers' commanders and the laboratory technician, it concluded that the jury was justified in inferring that the commanders conspired against the plaintiff based on evidence that they "deep-six[ed]" an exculpatory report, "tri[ed] to put [another officer] off the scent, and sign[ed] a deceitful report for use by the prosecution."  *Id.* at 993.  Additionally, there was evidence that the laboratory technician affirmatively altered a file number to cover up the conspiracy.  *Id.*

Similarly, the evidence in *Vasquez* was more substantial than in the case at hand.  In *Vasquez*, a stray bullet from an off-duty officer discharging his weapon while shooting at a target in his neighborhood struck and injured the plaintiff.  1994 WL 201092, at *2.  Plaintiff sued various members of the Cicero Police Department for conspiring to cover-up and thwart the investigation of her shooting, in violation of § 1983.  *Id.* at *1.  In that case, there was actual evidence that would allow a jury to infer a conspiratorial agreement: the defendants put the bullets from the underlying investigation into a desk drawer, rather than an evidence envelope;

some of the defendants denied that anyone was shooting at a target, despite the fact that a neighbor testified that she saw the target and the officers standing in the yard, in combat position; and, finally, there was evidence that some neighbors who observed the events were not questioned until after the FBI became involved in the investigation. *Id.* at *11. Although the *Vasquez* court doubted that there was "any evidence of a meetings of the minds or an understanding between the coconspirators," it ultimately concluded that was a jury question existed. *Id.* (noting that there was likely enough evidence to create a triable question of fact regarding such an agreement, but ultimately granting summary judgment in favor of the defendants for plaintiff's failure to satisfy another element). Comparatively, the evidence in the case at hand is almost entirely speculative: the Plaintiff wants a jury to infer, based on suspicious timing and Defendants' motive, that the Defendants formed an agreement to retaliate against her. Even considering *Jones* and *Vasquez*, we still conclude that the evidence is not enough from which a jury could infer a conspiratorial agreement by the Defendants. Therefore, Defendants' motion is granted for Count V.

## II. Immunity

### A. Absolute Immunity (Defendant Chambers)

Defendants argue that if we conclude that there is no evidence of a conspiracy, Chambers is entitled to absolute immunity. (Mem. at 12.) Although Plaintiff argues that our prior opinions regarding immunity prohibit Defendants from reasserting an immunity defense (Resp. at 17), a court can revisit its denial of immunity at the summary judgment stage, when the record is more fully developed. *See Parker v. Lane*, 688 F. Supp. 353, 358 (N.D. Ill. 1988); *see also Atlas v. City of North Chi.*, No. 03 C 4814, 2008 WL 816256, at *3 (N.D. Ill. Mar. 12, 2004); *Montalvo*

*v. Park Ridge Police Dep't*, 170 F. Supp. 2d 800, 803 (N.D. Ill. 2001). Defendants contend that because we first concluded that Chambers was entitled to absolute immunity, *Kelly v. Chambers*, No. 07 C 1005, 2007 WL 4293633, at *8 (N.D. Ill. Dec. 6, 2007), and only denied him such immunity after Plaintiff added her claim of conspiracy, *Kelly*, 2008 WL 4279976, at *4, he is entitled to absolute immunity if we conclude there is no evidence of a conspiracy. We agree.

In our 2008 opinion, we denied immunity to Chambers only because we concluded that "generating a false police report is not a legislative activity entitled to absolute immunity." *Id.* As we explained, in the Third Amended Complaint, Plaintiff alleged that Defendants "colluded to generate a false police report" and, therefore, "the relevant act for purposes of the immunity analysis [was] the creation of the false police report." *Id.* at *3. However, the facts in this case have developed and, as discussed above, Plaintiff has not provided sufficient evidence of a conspiracy to generate a false police report to withstand the present motion. Therefore, when considering whether Chambers is entitled to absolute immunity, we must consider only his role in the Committee's investigation of the allegations against Plaintiff. As we previously held, the "fact finding probe was a legitimate legislative activity," and Chambers is entitled to absolute legislative immunity. *Kelly*, 2007 WL 4293633, at *8.

**B. Qualified Immunity**

**1. Defendant Williams**

Defendants similarly argue that our 2008 denial of qualified immunity to Williams was based only on Plaintiff's allegation that he engaged in a conspiracy to create a false police report, and that if we conclude there was no evidence of such a conspiracy, he is subject to qualified

immunity. (Mem. at 12.) When evaluating a claim of qualified immunity, the Supreme Court directs district courts to consider whether the plaintiff has shown the deprivation of an actual constitutional right. *Pearson v. Callahan*, -- U.S. -- , -- S. Ct. -- , No. , 2009 WL 128768, at *6 (Jan. 21, 2009) (clarifying the elements that courts must consider, but retreating from its mandate in *Saucier* that this element must be considered before addressing the second element); *Saucier v. Katz*, 533 U.S. 194, 199, 121 S. Ct. 2151, 2155 (2001). Courts must also decide whether the "right at issue was 'clearly established' at the time of defendants' alleged misconduct," *Pearson*, 2009 WL 128768, at *6, or if "a reasonable [official], in light of the clearly established law, could have believed that his conduct was lawful." *Saucier*, 533 U.S. at 199, 121 S. Ct. at 2155.

Plaintiff alleges that she was deprived of her constitutional rights when Defendants retaliated against her for her exercise of her First Amendment rights. To establish such a claim, a non-employee plaintiff such as Kelly must show:

> (1) that [she] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [her] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [her] constitutional rights.

*Villagrana v. Village of Oswego*, No. 04 C 4603, 2005 WL 2322808, at *2 (N.D. Ill. Sept. 22, 2005) (noting that the Seventh Circuit had not yet addressed a non-employee First Amendment retaliation claim, but explaining that its standard in employee-based claims was similar to this standard) (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000)); *Chicago Reader v. Sheahan*, 141 F. Supp. 2d 1142, 1144 (N.D. Ill. 2001) (same). Plaintiff's conduct in proposing an alternative to the Village police department was undisputably a constitutionally protected activity. The remaining two factors, however, are disputed.

In determining whether the adverse action alleged can form the basis of a First

Amendment retaliation claim, we must undertake a "fact intensive inquiry that focuses on the status of the speaker, the status of the retaliator, the relationship between the speaker and the retaliator, and the nature of the retaliatory acts." *Suarez*, 202 F.3d at 686. Courts have concluded that "not every retaliatory act committed by a public official is actionable under § 1983." *Villagrana*, 2005 WL 2322808, at *3. For example, "where a public official's alleged retaliation is in the nature of speech, in the absence of a threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow, such speech does not adversely affect a citizen's First Amendment rights." *Suarez Corp. Indus.*, 202 F.3d at 687; *Kelly*, 2007 WL 4293633, at *8; *Villagrana*, 2005 WL 2322808, at *3.

In our 2007 opinion, we granted Williams qualified immunity because his alleged participation in the fact-finding investigation was limited to "pure speech." *Kelly*, 2007 WL 4293633, at *5. However, after Plaintiff amended her complaint to allege a conspiracy, we concluded that Williams' alleged conduct was more than just speech because it included an allegation that he colluded to generate a false police report. *Kelly*, 2008 WL 4279976, at *4. Because Plaintiff has not provided sufficient evidence of a conspiracy, the only remaining allegations against Williams are based upon his role in presenting the information in the report to the Committee. This conduct, as we concluded in 2007, is "pure speech" conduct. As such, it did not affect Plaintiff's right and Williams is subject to qualified immunity.

**2. Defendant Sabet**

Similarly, Defendants argue that if we find that there is not sufficient evidence of a conspiracy, Sabet is entitled to qualified immunity because he was not "personally involved" in Plaintiff's constitutional injury. (Mem. at 15.) Defendants first contend that the constitutional

violation at issue was "the initiation of the fact-finding inquiry," that Sabet did not participate in the inquiry, and that he simply prepared a report of the incident as ordered by Goldman. (*Id.*) However, Plaintiff is not claiming just that the investigation by the Committee was retaliation, but that Sabet's preparation of the police report, which she alleges was falsified, was part of the retaliation. (Resp. at 8.) Therefore, the fact that Sabet was not personally involved in the fact-finding inquiry is irrelevant to our qualified immunity analysis.

Defendants further argue that Sabet should be protected by qualified immunity because, like Williams, his alleged retaliation was "in the nature of speech." (Mem. at 16.) In our 2007 opinion, we recognized that a public official's speech does not adversely affect a plaintiff's First Amendment rights, unless it is accompanied by a "threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow." *Kelly*, 2007 WL 4293633, at *5 (quoting *Suarez Corp. Indus.*, 202 F.3d at 687). However, at the pleading stage, we rejected Defendants' argument that even if Plaintiff's allegations that Sabet falsified the police report were true, Sabet was entitled to qualified immunity because his actions were "pure speech." *Id.* Our rationale was that "the police report drafted by Officer Ramtin Sabet may suggest intimidation and punishment more than a mere form of written speech, particularly as it was generated two months after the traffic stop occurred, and a day after Plaintiff criticized law enforcement at a public meeting." *Id.* However, because the record is more developed now than at the motion to dismiss stage, Defendant may reassert his qualified immunity defense.

Considering the facts before us now, we conclude that Sabet was a public official and that his alleged retaliation was in the nature of speech and not accompanied by a "threat, coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action

[would] imminently follow."  *Suarez Corp. Indus.*, 202 F.3d at 678.  Plaintiff argues that Sabet

retaliated against her by generating a police report with false charges two months after the

underlying incident.  (Resp. at 8.)  Even assuming that the police report contained false

allegations, as we must since that fact is disputed, the report was not accompanied by threat,

coercion, or intimation of punishment.  Although Sabet admitted that he believed it was likely

that the report could be used for criminal prosecution, he also testified that he did not know how

the report would be used and that he did not think it would actually be used for her prosecution.

(Pl.'s SOF, Ex. F, ¶¶ 59-60, 62.)  Sabet only prepared the report at the orders of Williams and

Goldman.  (Def.'s SOF ¶¶ 58-61.)  Moreover, other testimony indicates that the Defendants were

not concerned with criminally prosecuting Plaintiff, but with allowing the Village Trustee's to

investigate the situation.  (*See* Def.'s SOF ¶¶ 86, 88, Ex. H, Chambers Dep. 129-31 ("[I]t wasn't

a matter of criminal at this juncture. . . . It had nothing to do with the incident now because the

incident became a nonincident once there was no citation written.")[15]; *id.* ¶ 113, Ex. I, Esplin

Dep.  103 (testifying that the "police . . . side of it [was] a dead issue").)  Additionally, Plaintiff

has not presented any evidence indicating that Sabet (or any other Defendant) used the report to

threaten Plaintiff; there is no evidence that Plaintiff even knew a report was created before its

presentation to the Board.  Therefore, the evidence now demonstrates that Sabet's alleged

retaliatory conduct in generating the report was in the nature of speech and was not accompanied

by threat, coercion, or intimidation intimating imminent punishment.  *Suarez Corp. Indus.*, 202

---

[15] We recognize that Chambers did ask the Village prosecutor, among other things, if
Plaintiff's conduct "was an arrestable offense."  (Pl.'s Resp. to Def.'s SOF ¶ 86, Ex. E,
Chambers Dep. 100.)  However, that inquiry is not inconsistent with his position that he did not
view the matter as a criminal matter.  The fact that he asked whether the allegations constituted
an arrestable offense does not indicate he planned to arrest her or seek criminal sanctions.

F.3d at 687.  Accordingly, it is not actionable.  *Id.*

Further, the fact that Sabet's report was presented to the Village Board does not make it intimidating, coercive, or threatening.  In *Villagrana*, the District Court concluded that plaintiff's allegations that police officers retaliated against him by sending his employer a copy of an allegedly false police report from an incident in which police were called to his house, did not constitute actionable retaliation because the police officers' speech was not accompanied by threat, intimidation, or coercion.  2005 WL 2322808, at *3-4.  The court reasoned that the "police officers' statements to [plaintiff's employer] carried no express threat, nor [could] they be interpreted as intimating that the Village police department would punish, sanction, or take any adverse action against [plaintiff's employer]."  *Id.* at *4.  Similarly, the presentation of the allegations in Sabet's report to the Village Board was not accompanied by threat, coercion, or suggestion of imminent punishment.  Williams presented Sabet's report and allowed the Board to perform its own investigation, which included questioning Plaintiff.  (Def.'s SOF ¶¶ 115-17.) Plaintiff's unwillingness to explain her version of events led to the censure, not Sabet's report. (*Id.* ¶ 120 ("The entire Board approved the censure resolution and it was done for Kelly's refusal to respond to what had happened and perhaps because she swore."; Pl.'s Resp. to Def.'s SOF ¶ 120 ("Plaintiff admits that the Board justified her censure by claiming it was a result of her refusal to respond to incriminating questions.").)  Because the report itself and its presentation to the Village Board were not threatening, coercive, or intimating punishment, Sabet's alleged retaliatory conduct is not actionable.

Plaintiff has failed to demonstrate a violation of her constitutional rights because she has not satisfied the elements for First Amendment retaliation.  Therefore, Sabet is protected by

qualified immunity and Defendants' motion for summary judgment for the First Amendment

retaliation claims against him is granted.

### III. *Monell* Claim (Counts VII-X)

Plaintiff argues that because Defendants failed to address her *Monell* claims in their

Memorandum in Support of their Motion for Summary Judgment, the claim should stand. (Resp.

at 8, n.4.) Although we recognize that Defendants did not address the *Monell* claims in a clearly

delineated section of their brief, the Defendants did make some arguments for why the claim

should be dismissed. (*See* Reply at 2-3 (discussing where, in its Motion and accompanying

Memorandum, they addressed that issue).)

Defendants first argued, in its Motion for Summary Judgment, that Plaintiff's *Monell*

claims are:

> retaliation claims against the Village claiming that the final policy-makers of the Village
> retaliated against the Plaintiff for engaging in constitutionally protected activity, and the
> Village maintains that it is entitled to judgment on these counts for the following reason:
> a) The Plaintiff will be unable to establish that the final policy-makers for the Village of
> Oakwood Hills, that is, the Board of Trustees, acted with any motivation to retaliate
> against the Plaintiff for exercising her free speech rights.

(Mot. ¶ 4.) Defendants supported that contention in their Rule 56.1 Statement of Facts. (*See*

Def.'s SOF ¶¶ 125-28 (stating that the Board is the "formal policy-maker for the Village," that

"none of the trustees had any role in the preparation of Sabet's police report," that they censured

Kelly for her refusal to explain her version of the events and her behavior at the meeting, and

that they were not "motivated in whole or in part by [Plaintiff's] exercise of her First

Amendment rights.").) Although Plaintiff denies those statements, her reasons for denying them

are based on circumstantial evidence relating primarily to Chambers, Williams, and Sabet. (*See*

Pl.'s Resp. to Def.'s SOF ¶¶ 126, 127.) Those three Defendants were not Trustees, and their

actions cannot be imputed to the Board.  Moreover, Plaintiff has voluntarily dismissed her claims against Trustee Esplin, the only Trustee Defendant in this case.  She prevents no evidence to support her denial of Defendants' statements that the Trustees did not have any role in the generation of the police report and that their actions were not motivated by Plaintiff's exercise of her free speech rights.  Contrary to Plaintiff's assertion that Defendants did not address this claim, Defendants mentioned it in their actual motion and reiterated their argument, albeit in passing, in their Memorandum.  (*See* Mem. at 5-6 (discussing testimony of Esplin and Trustees Theiss and Sutliff, which indicated that the Trustees did not know about the incident until December 2006 and that they did not censure Plaintiff because of her opinions regarding the police department).)

Defendants thus met their "initial responsibility of informing [us] of the basis for its motion and identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, together, with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006) (explaining that this burden is met "by simply 'showing – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case'") (quoting *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. at 2553).  Plaintiff has not presented evidence that creates a genuine issue as to the motivation or participation of the Trustees.  Although she has presented evidence that Esplin – who is no longer a defendant – was in contact with Mayor Chambers about the issue before the December 2006 Board meeting, even that evidence fails to create a genuine issue of fact regarding whether Esplin (and any other Trustee) conspired to retaliate against Plaintiff for exercising her First Amendment rights.

Accordingly, Plaintiff's *Monell* claims are dismissed.

## CONCLUSION

For the reasons stated above, we grant Defendants' motion for summary judgment in its entirety and deny Plaintiff's Motion to Strike.[16]

Honorable Marvin E. Aspen
United States District Judge

Date: March 23, 2009

---

[16] We also grant plaintiff's request to withdraw Counts VI, XI, XII, XIII, XIV, and the entire cause of action as to Defendant Esplin.